Filed 6/30/22  In re N.B. CA4/2
See Dissenting Opinion

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re N.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077503 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J283478, J283479 & J283480) |
| v. | OPINION |
| E.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

Appellant E.B. (mother) appeals from a juvenile court's order at an 18-month review hearing finding that it would be detrimental to return her daughters, Ne.B. and Na.B., to her care. Mother argues there was insufficient evidence to support the court's finding of detriment. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

*Previous Dependency Cases*

In February 2017, mother's son, M.S., was adjudged a dependent child under Welfare and Institutions Code[1] section 300, subdivisions (a), (b), and (g), due in part to mother physically abusing him. Mother made substantive progress in her reunification services, and on January 22, 2018, M.S. was returned to her under family maintenance services. On May 2, 2018, M.S. was discharged as a dependent of the court. During that case, mother gave birth to Na.B., who was adjudged a dependent of the court under section 300, subdivisions (a), (b), and (j), due in part to being at risk of similar abuse. Mother received reunification services, and Na.B. was returned to her care under family maintenance services. Na.B. was discharged as a dependent on January 22, 2018.

*Current Dependency Case*

On December 16, 2019, the San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of Ne.B., who was three months old at the time. The petition alleged that she came within the provisions of section 300,

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise noted.

subdivisions (a) (serious physical harm), (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). Specifically, the petition alleged there was a substantial risk that Ne.B. would suffer serious physical harm since mother had, on more than one occasion, threatened to harm her and kill her with a knife. The petition also alleged that mother had an untreated mental illness, was diagnosed with anxiety and depression and was not compliant with her medication regimen, and was placed on an involuntary psychiatric hold on December 11, 2019. The petition further alleged that Ne.B.'s half sibling, M.S., was adjudged a dependent of the court, in part because mother physically abused him; and Ne.B.'s sibling, Na.B., was adjudged a dependent, due in part to mother's failure to protect her. It also alleged her father, A.B. (father),[2] failed to protect her, and she was at risk of physical abuse.

CFS simultaneously filed a section 300 petition on behalf of Na.B., who was two years old at the time.[3] The petition contained the same allegations as Ne.B.'s petition, as they pertained to Na.B. The petition additionally alleged that Na.B. came within the provisions of section 300, subdivision (c), in that she was suffering serious emotional damage as a result of mother's conduct. The petition alleged that mother made threats to physically harm Na.B., and that mother grabbed a knife and pressed the tip into Na.B.'s bare chest.

---

[2] A.B. is the father of Na.B. and Ne.B. He is not a party to this appeal.

[3] CFS also filed a petition on behalf of M.S., who was 10 years old at the time. M.S. is not a subject of this appeal, so this opinion will not discuss his petition.

The social worker filed a detention report, stating that CFS received a referral with allegations of severe neglect of M.S., Na.B., and Ne.B. (the children) on December 11, 2019. It was reported that mother made several statements about hurting herself and the children, and she shared photographs with the maternal grandmother (MGM) depicting M.S. holding a kitchen knife to his chest and Ne.B. lying next to three kitchen knives. A social worker responded to the family residence and met with the paternal great grandmother, who let her into the home. Father was present but said mother's whereabouts were unknown. Father said he and mother had been married for two years, and he denied knowing whether mother had any mental illness. He said mother had a counselor but did not know how long she had been meeting with such counselor. Father said he did not discipline the children and did not know how mother disciplined M.S. He also stated he was unaware of what had occurred that morning since he was at work. The social worker reported that father was the father of Ne.B. and Na.B. (the girls), but M.S. had a different father (N.S.).

The social worker spoke privately with M.S. in the home. M.S. said mother became upset with him for dropping a pill on the ground. Upon saying he got in trouble and was placed in a time-out for an entire day, father entered the room and terminated the interview.

The social worker spoke with the MGM on the phone. The MGM reported that mother sent her numerous text messages stating she was going to kill the children and end her life too. Mother sent the MGM staged photographs of M.S. holding a knife to his chest, with the caption, "Be sure to cremate us," and of Ne.B. sleeping next to three

4

knives, with the caption, "Which one should I use." The MGM reported that a few days earlier, mother called her and made statements such as, "Are y'all ready for another suicide because I can't cope with everything over here. I'll take the three kids' life too." Mother was placed on an involuntary psychiatric hold at a hospital on December 11, 2019.

On December 12, 2019, the social worker spoke with M.S. again. He reiterated that mother was upset with him for dropping a pill on the floor. He said she pushed him, which resulted in him sustaining a scrape on his knee. She then got three knives, placed them on her bed, and forced him to choose one. She said, "So that's the knife you want in your body." M.S. also said mother wanted him to put the knife against his chest "because she didn't want me alive anymore because I dropped the pill." M.S. added that mother grabbed a knife and pressed the tip of it into Na.B.'s bare chest three times.

On December 13, 2019, the social worker spoke with mother on the phone. Mother said she found one of M.S.'s pills on the ground and tried to explain to him the dangers of losing his medication and not informing her. She said M.S. had a tantrum and rolled on the ground. Mother acknowledged that "something in [her] snapped to a degree," and she thought of ways she could prevent M.S. from hurting and/or killing the other children. She said, "If he's going to be a menace to society, why does he need to live?" Mother admitted to thinking about using a gun, but since she did not have one at her disposal, she "got the pointiest knives because that's what I had." Mother also admitted to thinking, "If I killed him, I would go to jail and the girls would have no one

5

so I thought of all of us dying too." Mother said she barricaded herself in the room with the children.

Mother reported being diagnosed with depression and anxiety in November 2017, and said she had not been compliant with her psychotropic medication regimen due to being pregnant with Ne.B.

The court held a detention hearing on December 17, 2019, and detained the children in foster care.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on January 8, 2020, recommending that the children be removed from the care of their parents and that mother (and N.S.) not be offered reunification services, but that father be offered services. The social worker reported that mother said the allegations were true as to M.S., but not the girls. Mother said M.S. was a threat to the girls and a trigger to her posttraumatic stress disorder (PTSD). Mother said M.S. was in the process of changing his medications since his psychotropic medications did not always work.[4] She justified what she did to M.S. because of his severe temper tantrums. Mother indicated she was unable to meet M.S.'s emotional needs and wanted to relinquish her parental rights to him.

---

[4] M.S. was diagnosed with PTSD, depression, autism spectrum disorder, intermittent explosive disorder, oppositional defiance disorder, and sexually reactive behavior. Thus, he was taking several types of psychotropic medication.

6

The social worker reported that mother was receiving predisposition services and stated she was in a residential treatment program that was assisting her with medication management. Mother was receiving counseling, exercise classes, and group support.

The maternal grandparents reported that mother had been demonstrating suicidal ideation since December 7, 2019, in that she was asking for a gun to kill herself. Furthermore, they said they informed father about mother's suicidal statements and attempted to contact him many times on December 11, 2019, regarding her suicidal and homicidal ideations, but he did not respond.

The social worker observed that mother was indifferent regarding the severity of her actions and presented as being justified "because [M.S.] is a problem child." The social worker opined that mother appeared flippant and did not show any remorse for the trauma she inflicted on the children. The social worker remarked that the photographs attached to the detention report were extremely unsettling, as the one of M.S. shows him crying while holding a knife to his chest; she opined that he looked "extremely terrorized." CFS was not willing to offer mother services, since it determined she suffered from a mental disability that made her incapable of benefitting from services or safely parenting the children. The social worker noted that mother's previous dependency involved serious physical abuse and mother received services, including parenting education, anger management, and individual counseling; however, she had not benefitted at all, as evidenced by her "horrendous abuse" of the children. Thus, the social worker recommended no services or visitation for mother. The social worker recommended services for father, in the best interest of the girls.

7

The court held a jurisdiction/disposition hearing on January 13, 2020, and noted there was a request to set the matter for trial. The court set a pretrial settlement conference and a contested jurisdiction/disposition hearing.

On March 2, 2020, the social worker submitted additional information to the court. Mother reported graduating from the Crisis Residential Treatment (CRT) program on January 16, 2020, and said she wanted to find her own therapist. She said she was medication compliant. Mother added that she and father were participating in anger management classes and domestic violence classes and had completed their parenting classes. The social worker asked her for a progress report from CRT and her treating psychiatrist regarding medication and treatment compliance, as well as the name of her chosen individual counselor. Although mother agreed to provide a signed release of information form and progress reports and certificates of completion, the social worker had not received any of them as of the writing of the report.

The social worker subsequently reported that she spoke with mother's individual therapist on April 1, 2020. The therapist said mother's first scheduled session was on March 11, 2020, but her phone number was disconnected, so the therapist had been unable to schedule more sessions. The social worker noted that the therapist was "unable to provide a statement that mother [was] safe to parent children." The social worker confirmed that mother did complete anger management and parenting programs. Furthermore, she completed two sessions each of domestic violence education and prevention. The social worker left voicemail messages for Dr. Puri, mother's treating psychiatrist, regarding mother's treatment compliance.

8

The social worker still felt there was a substantial risk of threat by mother to fatally harm the children, and she continued to recommend that mother not be offered reunification services. The social worker noted that this was not mother's first dependency case, and through her previous services she had been made aware of her behaviors while off of her psychotropic medication. Yet, she did not resume her psychiatric treatment until after CFS's intervention on December 11, 2019. While mother reported that her doctor took her off her medication a month before Ne.B.'s due date, Ne.B. was born in August 2019, which meant mother had four months before the incident in December to resume her mental health treatment. The social worker remarked that mother was responsible for treating her mental illness and keeping her children safe, and she wondered what would happen if mother again chose not to take her psychotropic medications.

As of June 24, 2020, the social worker reported that mother had not provided her with monthly progress reports by Dr. Puri, as requested. The social worker had not been able to speak with Dr. Puri to confirm mother's treatment compliance or to discuss mother's ability to safely parent the girls. Dr. Puri had not returned any of her phone calls.

The social worker did receive reports from mother's therapist. As of June 15, 2020, mother had completed eight individual counseling sessions. Mother reported that she was taking her prescribed medication for depression and anxiety. Her therapist opined that mother's risk of relapse to heightened stress, depression, and anxiety was low due to mother utilizing coping tools. However, mother reported that she did not feel

capable of caring for M.S. due to his mental health issues. The therapist recommended a minimum of four more sessions for mother to continue learning to implement coping tools to protect herself and her children, manage stress, and address triggers to heightened stress situations and "depressed-agitated mood and anxiety."

On October 7, 2020, the social worker submitted additional information to the court stating that mother participated in individual counseling, domestic violence education and prevention classes, and couples counseling. The social worker submitted a note from Dr. Puri dated June 23, 2020, which stated that mother was under her psychiatric care, and was compliant with her medications. Dr. Puri stated that mother was not depressed or psychotic, or a danger to herself or others "at present." She further stated that mother was mentally stable with medications. On October 6, 2020, Dr. Puri's receptionist reported to the social worker that mother was still treatment compliant and that Dr. Puri was seeing her every other month now because of her positive progress. In light of mother's progress and her treating psychiatrist's report that she was not a danger to herself or others, the social worker changed the recommendation to having the court order reunification services. The case plan included the requirements that mother continue to comply with her mental health treatment, see her psychiatrist regularly and take her prescribed psychotropic medication, and participate in counseling.

The court held a contested jurisdiction/disposition hearing on October 8, 2020, and sustained the children's petitions. The court removed them from their parents' custody, declared the children to be dependents, and ordered reunification services and visitation once a week.

*Status Review*

The social worker filed a six-month status review report on April 6, 2021, recommending that the girls be returned to father's custody while continuing mother's reunification services.  The social worker reported that mother was currently seeing her psychiatrist and appeared to be compliant with her medication.  She completed parenting, anger management, and domestic violence programs, but had not yet completed the individual counseling component.  The social worker reported that mother was ordered to attend individual therapy sessions and was initially referred on March 11, 2020, then on June 26, 2020.  She missed two sessions.  She was referred again on March 3, 2021, and started therapy with a different agency.  The social worker opined that the prognosis for reunification with mother was fair since there were still concerns regarding her ability to appropriately parent Na.B. and M.S., who had both been diagnosed with cognitive/developmental delays.  (Na.B. was assessed on March 4, 2021, and diagnosed with autism.)  Mother self-reported being apprehensive about M.S., due to his emotional outbursts and stated that his behavior had been a trigger for her in the past.  The social worker also reported that the structured decision making tool showed a very high risk for the children returning home to mother, based on her prior dependency history, characteristics of the children in the home, and her lack of completing her services.  The social worker opined that mother needed to complete individual therapy to address her past trauma and appropriate parenting practices with her children, and she needed to demonstrate her use of the tools gained from her services.

11

On May 25, 2021, a new social worker who had recently been assigned to the case filed additional information to the court. She reported that mother said she would get irritated with M.S. during supervised visits; it irritated her when he acted "like a baby" and when he canceled his visits with her. The social worker spoke with mother's therapist, who said mother had completed eight out of eight sessions on May 19, 2021. The therapist reported mother was addressing such issues as her history of molestation, the root of her anger with M.S., her detachment with him, and her past relationship with her first husband. The therapist requested eight more sessions to continue working with mother.

The court held a contested six-month review hearing on May 25, 2021, but noted they were still awaiting additional information. It further noted that mother was referred for an additional round of therapy, and there was a referral for family therapy. The court stated it wanted a more detailed update regarding mother's medication compliance, including what medication she was taking, who prescribed them, and the dosage. The court continued the hearing, but noted that by the time they come back, it would be a contested 18-month hearing. Mother requested unsupervised visits. However, counsel for the children objected, stating that they did not have verification that mother was medication compliant. The children's counsel further noted that mother had been referred to eight additional therapy sessions to address anger issues, and she wanted those issues addressed prior to any unsupervised visits. The court declined to order unsupervised visits and said it would address the issue of unsupervised visits again at the next hearing. It ordered her supervised visitation to be increased for the time being.

On June 16, 2021, the social worker filed additional information to the court. With regard to a safety plan, father stated he would take preventative measures by watching mother take her daily medication and counting her pills to ensure she was taking it, and he would make sure she was refilling her prescriptions and attending her doctor's appointments. He also said he would contact her doctor, psychiatrist, and CFS if she became noncompliant. Father said he would protect the children by ensuring they were "in a safe place with his grandmother," if mother had thoughts of suicide and/or harming the children. The social worker also reported that she met with mother, who provided a lockbox with her current medications, including the dosage and prescribing doctors. Mother reported that she was compliant. The social worker made several phone calls to her doctors to confirm but was unable to obtain written or verbal confirmation that mother was currently medication compliant. Mother reported that she was physically abused by M.S.'s father and was sexually assaulted as a child (from ages seven to 17) by 15 of her cousins, and her parents did not protect her. Her parents refused to believe she had been molested by 15 different cousins. The social worker recommended that mother complete a psychological evaluation.

The social worker attached a progress report from mother's therapist, which stated that at her first session mother agreed she was blaming M.S. for the actions that led to CFS intervention. Mother said she "lost it" when M.S. left pills on the ground, and she reacted by having thoughts of wanting to kill her three children. Mother said she was still considering giving M.S. up for adoption. The therapist stated that mother was in the beginning stages of her feelings of anger and detachment regarding M.S., which were

13

possibly related to issues of domestic violence with his father. Furthermore, the therapist stated her concern that mother had never expressed any emotion or concern about how her children felt on the night of the incident when she threatened to kill them. The therapist did note that mother expressed feelings of tenderness when she spoke of her visits with the girls and said the girls were not a trigger for her. The therapist's prognosis for remediation of mother's issues was "guarded." The goal/objective to be accomplished was for mother to "increase [her] protective capacity." The therapist requested an additional eight sessions in order for mother to accomplish this goal.

The court held a contested 18-month review hearing on June 17, 2021, and noted the recommendation was to return the girls to father on family maintenance with some conditions and to terminate mother's reunification services. The recommendation for M.S. was a permanent planned living arrangement (PPLA). Mother's counsel objected to the recommendation to terminate mother's services. She recognized that they were "beyond the .22 date," but argued that mother had been very cooperative with CFS and cooperative in complying with the services so far. Mother's counsel noted that mother had completed her first round of counseling with the therapist, parenting classes, anger management, and a domestic violence program; she was also medication compliant and had been working with CFS to provide proof of her medications. Counsel added that mother had been seeing a private psychiatrist, had been visiting appropriately, and was engaged in family therapy with M.S. Counsel for the children asked the court to follow the recommendation and agreed with family maintenance for father. Counsel acknowledged that mother had been engaged in her services, but stated the "big

14

component" mother was missing was the benefit from those services. The children's counsel asserted that mother was still struggling with her mental health and asked the court to terminate her services.

The court found by a preponderance of the evidence that return of custody to mother continued to be detrimental in that the girls' welfare required that custody be removed since return would create a substantial risk of detriment. The court terminated mother's reunification services. It commented that mother had engaged in her case plan since the beginning of the case and had made a sincere effort to resolve the issues; however, there clearly remained safety issues that needed to be resolved before the girls could be safely returned to her, as outlined by the social worker's report and the most recent therapy report, and she was beyond the 18-month date. The court found that father had made substantial progress, continued the girls as dependents, and ordered them returned home to father on family maintenance on the condition that mother not live in the home. The court continued mother's supervised visits and increased her hours, with father supervising them in accordance with the safety plan he worked out with the therapist. It also ordered "enhancement services for [mother] to improve visitation."

As to M.S., the court ordered PPLA as the permanent plan. The court also ordered "one-time discretionary services [for mother] with a full case plan" under the permanent plan. The case plan would include a psychological evaluation and continued therapy and medication monitoring. The court noted its concern that mother was on a large amount of medication, but it was not clear whether the different prescribing doctors were aware of the other prescriptions. Thus, the court ordered CFS to ensure that at least one doctor

15

was aware of all the prescriptions and was in agreement with them. The court authorized CFS to place M.S. with the maternal grandparents in Texas, upon ICPC (Interstate Compact on the Placement of Children) approval.

DISCUSSION

There Was Sufficient Evidence to Support the Court's Finding of Detriment

Mother contends the court's finding that it would be detrimental to return the girls to her custody was not supported by substantial evidence. She argues that during the 19 months after CFS removed them from her custody, she made outstanding progress, consistently participated in therapy, completed various components of her case plan, maintained consistent and appropriate contact with the girls, and resumed her medication regimen. Mother points to her psychiatrist's conclusions that she was no longer a "danger to herself or others," and that she was "mentally stable with medications." She also points to positive comments made by her therapist regarding her progress made. We conclude the evidence was sufficient to support the court's finding of detriment.

A. *Relevant Law*

"The Legislature has determined the juvenile court may generally offer family reunification services for a maximum period of 18 months." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864 (*Georgeanne G.*).) At the 18-month permanency review hearing, "the juvenile court must order a child returned to a parent's custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional

16

well-being." (*Ibid.*; see § 366.22, subd. (a)(1).) "The social worker shall have the burden of establishing that detriment." (§ 366.22, subd. (a)(1).)

"In deciding whether it would be detrimental to return a child, the easy cases are ones where there is a clear failure by the parent to comply with material aspects of the service plan." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) "The harder cases are, like the one before us, where the parent *has* complied with the service plan, but for some reason has not convinced a psychologist or social worker that it would be safe to return the child to the parent. The problem is not, as it were, quantitative (that is, showing up for counseling or therapy or parenting classes, or what have you) but qualitative (that is, whether the counseling, therapy or parenting classes are doing any good)." (*Ibid.*) In other words, "simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143.)

"We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 864-865.)

17

B.  *The Evidence Supported the Court's Finding*

The court's concern in returning the girls to mother was not based on her lack of compliance.  Mother participated in reunification services and completed parenting, anger management, and domestic violence programs.  She also saw her psychiatrist and participated in individual therapy.  The court recognized mother's sincere efforts.  However, it found there were issues that still needed to be resolved before the children could be safely returned to her, but she had reached the 18-month statutory time limit.  The evidence supports such finding.

The evidence showed mother got mad at M.S., pushed him, and forced him to choose a knife to use to kill him.  She barricaded herself in a room with the children, and stated she was going to kill them and end her life too.  The evidence showed that mother grabbed a knife and pressed the tip of it into Na.B.'s bare chest three times.  Furthermore, she sent the MGM staged photographs of M.S. holding a knife to his chest, with the caption, "Be sure to cremate us," and of Ne.B. sleeping next to three knives, with the caption, "Which one should I use."  As the social worker noted, the photographs were extremely unsettling, as the one of M.S. showed him crying while holding the knife to his chest, and he looked "extremely terrorized."  The evidence additionally showed that, a few days prior, mother had called the MGM and threatened to commit suicide and kill the children because she could not "cope with everything over here."  Mother's frightening conduct illustrated she had serious mental issues, and the evidence showed she was indifferent about the severity of her actions and felt justified in what she had done because M.S. was "a problem child."

Mother claims she successfully engaged in treatment with Dr. Puri and "established medication compliance." However, the evidence does not support such conclusions. Mother had regular sessions with Dr. Puri, and on June 23, 2020, Dr. Puri submitted a note to the social worker stating that mother was not depressed or psychotic, or a danger to herself or others "at present." Dr. Puri also stated that mother was "mentally stable with medications." Mother points to this evidence in support of her position that it would be safe to return the girls to her custody. However, Dr. Puri's note was written in June 2020, and she was commenting on mother's condition *at that time*, and while mother was on her medication. In other words, the note was written one year prior to the 18-month hearing. Moreover, as respondent points out, Dr. Puri had no opinion regarding mother's ability to parent the girls if returned to her custody.

Furthermore, as mother concedes, she posed a significant risk to the girls' safety when she was not on her medication. At the contested status review hearing on May 25, 2021, the court stated it wanted a more detailed update regarding her medication compliance, including what medication she was taking, the names of the prescribing doctors, and the dosages. Subsequently, mother showed the social worker a lockbox with her current medications, including the dosage and prescribing doctors, and she self-reported that she was compliant. However, the social worker attempted but was unable to obtain written or verbal confirmation from mother's doctors that mother was actually medication compliant. Thus, at the time of the 18-month hearing, there was apparently no independent evidence to corroborate mother's self-serving claim that she was medication compliant. Without confirmation that mother was medication compliant, and

19

evidence that the children could be safely returned to mother at that time, the court could not safely return the girls to her care. Such return was fraught with danger, that is, a substantial risk of detriment to the safety of the children. We note that mother was aware of her dangerous behaviors while off of her psychotropic medication from her services in the previous dependency cases. Yet, at the time of the current incident, she admitted she had not been compliant with her psychotropic medication regimen due to being pregnant with Ne.B. She said her doctor took her off her medication a month before Ne.B.'s due date. However, Ne.B. was born in August 2019, which meant mother had four months before the current incident in December 2019 to resume taking her medication. Despite knowing she was not mentally stable without her medication, she did not resume taking it until after CFS intervened in the current case.

As to mother's therapy, the evidence showed that she did participate in individual counseling, but her progress was not sufficient to return the girls to her custody. The social worker spoke with mother's therapist on April 1, 2020, and the therapist was unable to state that mother was safe to parent the girls. By June 2020, the social worker reported that mother was attending her sessions, and the therapist opined that her risk of relapse to heightened stress, depression and anxiety was low. Nonetheless, although mother had completed eight of the eight sessions required by CFS, the therapist still recommended a minimum of four more sessions to address mother's mental health issues and to support her through the reunification process. The therapist stated that mother needed to learn and practice using coping tools to address her triggers to heightened

20

stress situations and "depressed-agitated mood and anxiety." She also needed to improve her communication and parenting skills.

In the status review report filed on April 6, 2021, the social worker opined there continued to be a detriment to the safety of the children, since mother said M.S.'s emotional outbursts triggered her mental health issues, and she was concerned about her own capacity to care for him appropriately. Additionally, the structured decision making tool showed a "very high risk" for returning the girls home to mother, based on her prior dependency history, characteristics of the children in the home, and her failure to complete her individual therapy and demonstrate use of the tools learned from her services.

Furthermore, as late as May 29, 2021, mother and the therapist were just starting to explore the issue of mother's detachment from M.S. as an infant due to the domestic violence she suffered with his father. The therapist also stated that mother said she was sexually abused by 15 different cousins as a child, and her parents were not protective of her. Although these issues did not involve the girls, they illustrate that mother had a serious history of trauma she still needed to work through that could affect her parenting. Her therapist was particularly concerned that mother never expressed any emotion or concern over how the girls felt when she threatened to kill them. We further note the therapist's prognosis for remediation of mother's issues of understanding why CFS was involved with her family and her ongoing mental health issues was "guarded." Significantly, the therapist felt that mother needed an additional eight sessions, since she continued to have thoughts of harming or killing M.S., and she had not achieved the goal

of increasing her protective capacity. Accordingly, by the time of the 18-month hearing, the therapist was still recommending more therapy.

Mother concedes that her relationship with M.S. continued to be problematic and she recognized her inability to care for him, but she maintains there was insufficient evidence that her mental illness history presented a similar risk of detriment to the girls. However, the evidence shows that mother had longstanding issues of anxiety, depression and anger, and when she "snapped" in the current case, she barricaded herself in a room with the children, placed three knives next to Ne.B. and asked the MGM which knife she should use to kill her. She also pressed the tip of a knife into Na.B.'s bare chest. Although mother said the girls were not a trigger for her, the evidence demonstrated that she placed them in a dangerous situation, even when triggered by something else. Moreover, it is concerning that mother did not express any remorse for her actions, even after completing numerous programs and having extensive amounts of therapy. In light of the evidence, we cannot say that mother's mental illness history did not present a risk of detriment to the girls.

We note mother's contention that the court had the statutory duty to return the girls to her custody and provide her with family maintenance services. Mother cites sections 366.22, subdivision (a), and 16506, in support of this claim. Section 16506 simply states that family maintenance services shall be provided in order to maintain the child in his or her own home. However, such provision was inapplicable since the court here properly concluded at the 18-month review hearing that it would be detrimental to

22

return the girls to mother's custody. (§ 366.22, subd. (a).) Therefore, contrary to her claim, the court had no duty to provide mother with family maintenance services.

We further note the court returned the girls to father's custody under family maintenance. Mother contends that since father expressed his commitment to monitor her medication and promptly contact her care providers if she failed to comply, it was safe to return the girls to her custody. However, nothing in the record suggests that father would necessarily have followed through. The record shows he was living with mother and the girls at the time she threatened to kill them; however, when the social worker came to the house that day to investigate, father did not know what had occurred that morning, since he was at work. The maternal grandparents had informed him about mother's suicidal statements and attempted to contact him many times that day regarding her suicidal and homicidal ideations, but he failed to respond. Father said he did not know mother had a mental illness, and he did not know how long she had been seeing a counselor. He also said he did not discipline the children or know how mother disciplined M.S. Since father worked and was apparently not involved with his wife or children, it is pure speculation to say it would be safe to return the girls to mother's custody under father's watch.

Ultimately, on this record, we conclude there was substantial evidence to support the court's finding that it would be detrimental to return the girls to mother's custody. In light of the traumatic issues from mother's past she still needed to work through, her continued thoughts of harming or killing her son, her lack of concern about how her conduct affected the girls, her failure to reach the treatment goal of increasing her

23

protective capacity, and her therapist's recommendation that she still needed eight more sessions at the time of the 18-month hearing, the court properly concluded that the girls could not be safely returned to her custody.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS_____
                                                      Acting P. J.


I concur:


RAPHAEL_____
                        J.


24

[*In re N.B. et al.; CFS v. E.B.*, E077503]

MENETREZ, J., Dissenting.

The only issue presented on this appeal is whether the record contains sufficient evidence to support the juvenile court's finding that return of the two youngest children to the custody of appellant E.B. (Mother) at the 18-month review hearing posed a substantial risk of detriment to those children. Because I believe the evidence is insufficient to support that finding, I respectfully dissent.

The incident that generated this case was extremely serious: In December 2019, Mother appeared to be threatening to kill her children and herself. Two causes of the incident were identified: (1) Mother had stopped taking her psychotropic medication when she was pregnant and did not resume taking it after she gave birth, and (2) Mother's oldest child, Miguel, has various behavioral and emotional issues that trigger Mother.

In June 2020, Mother's psychiatrist reported that Mother was medication compliant. The record contains no evidence that she subsequently stopped taking her medication. As of the 18-month review hearing in June 2021, Mother claimed that she continued to be medication compliant. Again, the record contains no evidence to the contrary. The record likewise contains no evidence that Mother was manifesting any mental health symptoms or behaviors that might indicate she was off her medication. In addition, the father of the two youngest children, who made sufficient progress that both children were returned to his custody at the 18-month review hearing, told the social worker that he would actively monitor Mother's medication compliance and would take immediate corrective action if she became noncompliant. And if the children were

1

returned to Mother, they would still be under court supervision, so the social workers could continue to monitor Mother's medication compliance and mental health status as well.

The record also confirms that the risk that Miguel would again trigger Mother to decompensate was eliminated. Mother acknowledged that she cannot safely and appropriately parent Miguel, and she abandoned the pursuit of reunification with him.

Despite the evidence that Mother no longer posed a risk to the two youngest children, the juvenile court declined to return the children to Mother at the 18-month review hearing, finding that there was still a substantial risk of detriment. Insofar as the record contains any evidence tending to support that finding, the evidence shows only imperfect compliance with Mother's case plan programs—for example, she completed parenting, domestic violence, and anger management programs and had engaged in *but had not completed* individual counseling—or imperfect progress in treatment—for example, although Mother's individual therapist opined that Mother did not present any "[c]urrent [r]isk [f]actors," the therapist also described Mother's prognosis as "[g]uarded."

When evaluating the risk of detriment at a family reunification review hearing, however, courts are supposed to be "looking for passing grades . . . , not straight A's." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 790.) The standard for the detriment finding "'must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or

2

other family member.'  It must mean what it says:  that return presents a *substantial* risk of detriment to the child."  (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505.)  Mother did not have to prove that she was a perfect parent.  Rather, the juvenile court was required to return the two youngest children to Mother unless the child welfare agency proved a substantial risk of detriment, that is, a substantial risk that Mother would fail to parent the children safely.  (Welf. & Inst. Code, § 366.22, subd. (a)(1).)

The record here contains no evidence of such a risk.  Any risk caused by Mother's relationship with Miguel was gone.  The evidence showed that Mother was medication compliant, and there was no evidence to the contrary.  There was no evidence that Mother was otherwise manifesting mental health symptoms that would make her an unsafe parent, and the children would continue to be under court supervision if returned.  The juvenile court's detriment finding consequently was not supported by substantial evidence.  The order continuing the two youngest children out of Mother's custody accordingly should be reversed, and I therefore respectfully dissent.

MENETREZ

J.

3